RAY, ROBERTSON and MAUZY, JJ., join in this dissenting opinion.

**Vernon Walter ROBERTS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 211–85.

Court of Criminal Appeals of Texas, En Banc.

Jan. 25, 1989.

Rehearing Denied March 1, 1989.

Steven H. Swander, on appeal only, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall and David K. Chapman, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

### PER CURIAM.

Vernon Walter Roberts, henceforth appellant, was convicted by a jury of the offense of murder. The trial judge assessed appellant's punishment, enhanced with one prior felony conviction, at 62 years' confinement in the Department of Corrections.

On direct appeal, the Second Court of Appeals reversed the trial court's judgment of conviction after finding that the trial court erred in refusing to give the jury appellant's requested intructions on the lesser included offenses of involuntary manslaughter and criminally negligent homicide. See *Roberts v. State*, 682 S.W. 2d 438 (Tex.App.–2nd 1984).

We granted the State's petition for discretionary review in order to make the determination whether the court of appeals correctly reversed the trial court's judgment of conviction for the above reasons.

We now find after careful review of the record, the briefs of the parties, and the opinion of the court of appeals that the State's petition for discretionary review was improvidently granted.

Accordingly, the State's petition for discretionary review is ordered dismissed. Also see *Sheffield v. State*, 650 S.W.2d 813 (Tex.Cr.App.1983).

McCORMICK, Presiding Judge, dissenting.

The Fort Worth Court of Appeals reversed appellant's conviction for murder on the grounds that the trial court erred in failing to charge the jury on the lesser included offenses of involuntary manslaughter and criminally negligent homicide. *Roberts v. State*, 682 S.W.2d 438 (Tex.App.—Fort Worth 1984).

The State's evidence showed that appellant and his wife Wanda were separated; and, although they spent some amicable time together during the separation, Wanda was afraid of appellant. A few days before the offense, appellant told Wanda's uncle he was determined to see her. That same day he apparently threatened to kill her.

On the day of the offense, appellant crashed into Wanda's apartment with a pistol in his hand. Wanda and her daughter Lee Ann were there. Appellant confronted Wanda, and they told one another to "put down the gun." Appellant did put his gun on the floor but presently reached for it and threatened to shoot Lee Ann. Lee Ann heard a gunshot, then got up and began beating appellant with the telephone. She was shot in the chin—she thought by appellant—and lost consciousness.

Wanda's body was found in a nearby closet. Next to the body was a .38 caliber bullet. Beneath the body was the double-barreled shotgun Wanda had taken with her at the time of her separation from appellant. Both shells in the shotgun had been fired.

Wanda had been shot twice in the chest at close range—6 to 12 inches—and one of these wounds had caused her death. A few days before the offense appellant had bought a .357 magnum pistol which could have fired the .38 caliber bullet and could also have caused Wanda's chest wounds.

Shortly after the offense, appellant drove up to a hospital and told a nurse that he had been shot and the police were after him because he had "killed a couple of people."

Appellant testified that he took the .357 magnum to Wanda to trade her for the shotgun and a pistol she had also taken when she and appellant separated. And he asserted there were several other amicable reasons for his visit to her on the day of the offense. However, when she did not answer the door, he became angry and kicked the door open. Inside he found Lee Ann lying on the bed and Wanda standing by the closet, shotgun in hand. Wanda asked him about the pistol, which he promptly tossed on the floor. She then fired the shotgun twice; one shot went over his head, the other hit him in the hands.

According to appellant, both he and Wanda then went for the pistol, which was still on the floor. They struggled over the gun, which went off three times during the struggle and also fell to the floor several times. At one point, Wanda used the shotgun as a club to knock the pistol from appellant's hand. At another time during the struggle appellant felt blows to his head from an unseen source (presumably Lee Ann).

After the gun discharged the third time, appellant retrieved it and turned to talk to Wanda, but she did not reply. He then left the apartment.

The remaining defensive testimony was from Eloise Ray. She stated that Lee Ann told her, shortly after the homicide, that she knew appellant meant no harm to Wanda on the day of the offense—if Wanda had not shot appellant, everything would have been all right. Lee Ann denied making these statements.

In rebuttal, the State offered two witnesses whose testimony tended to show that appellant's wounds were inconsistent with his version of the facts.

In concluding that the trial court erred in refusing the requested instructions, the Court of Appeals said:

"Under these facts, the jury could have disbelieved Roberts' testimony that he did not mean to point the gun at the deceased but believed his testimony that he did not intend to hurt her. In that event, the jury could infer that Roberts acted recklessly, as defined, in struggling with deceased over the gun. Alternatively, even though Roberts had a lot of experience with guns, the jury could have inferred from the facts that the circumstances developed quickly in such a way so as to cause him not to be aware of the risk of death to the deceased." 682 S.W.2d at 442.

This analysis is incorrect for two reasons. First, there is *no* evidence in the record to support the statement that appellant "did not mean to point the gun at the deceased." Secondly, appellant's testimony was that he did not intend to harm Wanda "when he first went to her apartment." Appellant's only testimony was that after he had been shot in the hands by Wanda he observed Wanda go for the .357 on the floor and that a struggle ensued over possession of the weapon. During this struggle appellant testified that he was "afraid of getting shot and getting killed" and was "struggling, I thought, to save my live."

Clearly, appellant's testimony did raise the absence of any intent to kill, but there is nothing in the record which would show that, if guilty, appellant was guilty *only* of involuntary manslaughter or criminally negligent homicide. There are no facts upon which a conclusion of recklessness or criminal negligence could be based.

In *Lugo v. State*, 667 S.W.2d 144 (Tex. Cr.App.1984), a unanimous Court held that if the evidence, from any source, raises the issue of a lesser included offense, then such a charge must be given to the jury, even though the evidence is contradictory. In the instant case the State's evidence, presented through Lee Ann, showed a threat by the appellant with no struggle for the gun. Appellant's version was that of a struggle with no threats being present. No mixing of these contradictory theories can produce an issue of recklessness or criminal negligence.

I do not believe that this Court intended, in *Lugo* and its progeny, to advance a rule that stands for the proposition that an appellant can string together contradictory versions of a fact situation in order to be entitled to lesser included offenses.

I must, therefore, dissent to the Court's conclusion that the State's petition for discretionary review was improvidently granted.

W.C. DAVIS, CAMPBELL and WHITE, JJ., join in this dissent.